Saad, P. J.
 

 Defendant appeals as of right a jury trial conviction of solicitation to commit murder, MCL 750.157b, conspiracy to commit murder, MCL 750.157a(a) and MCL 750.316, conspiracy to obstruct justice, MCL 750.157a(a) and MCL 750.505, and common-law obstruction of justice, MCL 750.505. The trial court sentenced defendant to concurrent terms of life
 
 *213
 
 imprisonment for both the solicitation and conspiracy to commit murder convictions, and one to five years each for the conspiracy to obstruct justice and obstruction of justice convictions.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 In March 1999, the Gibraltar Police arrested both defendant Kent Sexton and Frank Slavik after the police received information from Brian Gross that the two robbed a Total gasoline station in 1997. The record indicates that the prosecutor also considered charging Gross with participating in the robbery, but that the charge was dropped after Gross assisted in the robbery investigation and subsequent court proceedings. Gross testified as a key witness against defendant and Slavik at their preliminary examination on March 30, 1999, after which both defendant and Slavik were bound over for trial on armed robbery charges. Slavik posted bond later that day and defendant was released on bond on April 19, 1999.
 

 Several witnesses testified at trial regarding the events surrounding the charges in this case. Slavik testified that he and defendant became friends after defendant started working at a car audio store Slavik managed in 1994. The two worked together for approximately four years and, after Slavik left his job to start his own roofing business, the two maintained a friendship.
 
 [1]
 
 According to Slavik’s testimony and his statements to the police, on May 5, 1999, Slavik visited defendant at his workplace, Palco Electronics, in
 
 *214
 
 Southgate. While talking about the armed robbery charges, defendant commented to Slavik that the charges would be much more difficult to prove if Gross did not testify at trial. Defendant further stated that his friend “Charlie” was interested in “taking the job.”
 

 During their conversation, defendant asked if Slavik remembered seeing a man in the courtroom during their preliminary examination, whom defendant identified as “Charlie.” Slavik recalled seeing the man in court and identified him during this trial as Charles Milstead. Defendant further told Slavik that Milstead was at the preliminary examination to kill Gross, but that he was unable to do so on that day. However, defendant explained that the preliminary examination allowed Milstead to identify and gather information about Gross in order to kill him.
 

 According to Slavik, he told his attorney about defendant’s comments to avoid being implicated if someone murdered Gross. Slavik testified that he also told his attorney that, at a motion hearing on May 17, 1999, defendant again talked about eliminating Gross and asked Slavik if he had $7,500, which Milstead demanded to be paid in two installments to perform the killing. Slavik’s attorney notified Gibraltar Police Lieutenant George Hammerle about defendant’s statements and, after talking to Slavik on May 24, 1999, Lieutenant Hammerle contacted the Michigan State Police. On June 3, 1999, Slavik repeated his conversation with defendant to Lieutenant Hammerle and state police Detective Sergeant Norman Lipscomb. Lieutenant Hammerle also provided Sergeant Lipscomb with a picture of Charles Milstead, whom he suspected
 
 *215
 
 was the man Slavik saw at the preliminary examination.
 

 Later that day, June 3, 1999, Sergeant Lipscomb asked Slavik to meet with defendant while wearing a hidden recording device in order to gather more information about the potential murder. Slavik complied and, wearing a wire, he went to Palco Electronics to talk to defendant. During the recorded conversation, which was also videotaped by Sergeant Lipscomb, defendant and Slavik talked about Milstead’s involvement and defendant unsuccessfully tried to reach Milstead by telephone. After Slavik left, Sergeant Lipscomb told Slavik to notify him if either Mil-stead or defendant tried to contact him. Over the next week, Slavik testified that he notified Sergeant Lipscomb after defendant left messages on his answering machine, including one letting Slavik know when Mil-stead would contact him
 

 On June 10, 1999, Slavik allowed Sergeant Lipscomb to connect a recording device to his home telephone to record conversations and messages. Over the next four days, Slavik recorded several telephone calls, all of which were played for the jury at trial. At various times, defendant left messages for Slavik to call him and Milstead left a message for Slavik to contact defendant. During one conversation on June 14, 1999, defendant instructed Slavik that Milstead would call Slavik at 11:30 P.M., and that if he did not call, Slavik should call Milstead. That night, Slavik did not receive Milstead’s call, so Slavik called Milstead twice and left messages. Milstead returned Slavik’s call after 1:00 A.M. and offered to meet Slavik at Elizabeth Park in Trenton the next day.
 

 
 *216
 
 Before the appointed time on May 15, 1999, Slavik met Sergeant Lipscomb at the state police post and was outfitted with a recording device. Sergeant Lipscomb also provided Slavik with $3,500 in marked currency and followed Slavik to the park where several other officers were already positioned. Milstead arrived shortly after Slavik drove into the parking lot and the two talked for an hour to an hour and a half, all of which was recorded on audio and video tape by the state police. During the conversation, Milstead described several methods he might use to kill Gross. Milstead also recounted his involvement in several prior violent incidents involving unrelated parties. Milstead also told Slavik that he planned to kill Gross in two or three weeks, after he gathered more information. Near the end of the encounter, Slavik opened his trunk and handed Milstead an envelope containing $3,500. Milstead took the envelope and Slavik told Milstead he could sit inside Slavik’s car to count the money. As Slavik and Milstead sat in Slavik’s car, the police approached and placed Milstead and Slavik under arrest. The police arrested defendant at his home later that day.
 

 Following a preliminary examination before 33rd District Court Judge Donald L. Swank on June 29, 1999, defendant was bound over for trial on charges of solicitation to commit murder, conspiracy to commit murder, conspiracy to obstruct justice, and common-law obstruction of justice. Thereafter, defendant filed in the Wayne Circuit Court a motion to quash the information and to dismiss the charges. Following a hearing on September 21, 1999, the trial court denied defendant’s motions. Defendant and Milstead were tried together before one jury, and the jury found
 
 *217
 
 defendant guilty of the above charges on November 9, 1999.
 
 [2]
 

 II. ANALYSIS
 

 A. ENTRAPMENT
 

 Defendant contends that the trial court erred in denying his motion to dismiss, which was brought on the ground of entrapment. We disagree.
 

 As this Court recently explained in
 
 People v McGee,
 
 247 Mich App 325, 344; 636 NW2d 531 (2001):
 

 Whether entrapment occurred must be determined by considering the facts of each case and is a question of law for the court to decide.
 
 People v Patrick,
 
 178 Mich App 152, 154; 443 NW2d 499 (1989). The trial court must make specific findings regarding entrapment, and we review its findings under the clearly erroneous standard.
 
 People v Juillet,
 
 439 Mich 34, 61; 475 NW2d 786 (1991);
 
 People v Connolly,
 
 232 Mich App 425, 428; 591 NW2d 340 (1998). The findings are clearly erroneous if this Court is left with a firm conviction that a mistake was made.
 
 Id.
 
 at 429.
 

 Entrapment occurs if “(1) the police engage in impermissible conduct that would induce an otherwise law-abiding person to commit a crime in similar circumstances, or (2) the police engage in conduct so reprehensible that it cannot be tolerated by the court.”
 
 McGee, supra
 
 at 344-345. The defendant bears the burden of proving entrapment by a preponderance of the evidence.
 
 People v Pegenau,
 
 447 Mich 278, 294; 523 NW2d 325 (1994). The test for entrapment is
 
 *218
 
 objective and “focuses on the propriety of the government’s conduct that resulted in the charges against the defendant rather than on the defendant’s predisposition to commit the crime.”
 
 People v Hampton,
 
 237 Mich App 143, 156; 603 NW2d 270 (1999). “Entrapment will not be found where the police did nothing more than present the defendant with the opportunity to commit the crime of which he was convicted.”
 
 McGee, supra
 
 at 345.
 

 Here, the trial court decided the question of entrapment at a pretrial hearing after reviewing the transcripts of the preliminary examination, five audiovisual exhibits, and after hearing two five witnesses, defendant and his mother. Defendant denied any conspiracy to commit murder, and insisted that Slavik lied at the preliminary examination about defendant’s involvement. Defendant further testified that Slavik called him repeatedly about contacting Milstead, and that defendant finally gave Slavik Milstead’s telephone number without asking why he needed it.
 

 We reject defendant’s contention that the police exerted excessive control over Slavik. First, the Michigan State Police became involved in this case only after Slavik sought guidance from his attorney, his attorney initiated contact with the police, and Slavik agreed to cooperate with the investigation to prevent Gross’ death. No evidence suggests that the police controlled Slavik’s activities or behavior or that they pressured him to take part in the investigation. Further, though Sergeant Lipscomb asked Slavik to talk to defendant, Slavik specifically testified that Sergeant Lipscomb did not tell him what to say to defendant or what information he should try to elicit. Indeed, the police were involved only to the extent
 
 *219
 
 that they listened to defendant talk about his plan to have Gross killed, without prompting or coercion by Slavik. Thus, evidence strongly repudiates any indication that the police used Slavik to manufacture a crime or to induce defendant to discuss his role in it.
 

 For similar reasons, we find no merit to defendant’s claim that the police used Slavik to exert pressure on defendant or to take advantage of their friendship. At Slavik’s meeting with defendant on June 3, 1999, Slavik followed Sergeant Lipscomb’s instruction by not prompting defendant to discuss the killing. Thereafter,
 
 defendant
 
 initiated contact with Slavik regarding the plan and Milstead’s involvement. Contrary to defendant’s claims, the evidence clearly preponderates against a finding that Slavik continuously called defendant at the behest of the police or encouraged him to further his plans. Furthermore, while evidence confirmed that defendant and Slavik were friends, the record clearly shows that the police became involved only after defendant twice initiated discussions with Slavik about hiring Milstead to kill Gross. Thus, the police did not encourage Slavik to implore defendant to join in a criminal enterprise; defendant established the plan before any police involvement. Moreover, when Slavik talked to defendant on June 3, 1999, he was merely confirming what defendant had already discussed regarding Gross’ murder. Indeed, as the trial court observed, if defendant had not already planned to have Gross murdered, he would have expressed surprise, confusion, or resistance about the topic during the videotaped visit by Slavik. Instead, defendant expressed his familiarity with the plan and
 
 *220
 
 discussed it openly with Slavik without prompting or appeals to friendship.
 
 [3]
 

 We also disagree with defendant’s allegation that the police conduct would have induced an otherwise law-abiding citizen to engage in criminal behavior. Not only did defendant introduce the plan to have Gross murdered, Slavik exerted no pressure on defendant to initiate or carry out his plan to murder Gross. Further, while Slavik agreed to talk to Milstead and also agreed to provide at least part of the money Mil-stead demanded for the killing, this was clearly “ ‘insufficient to induce or instigate the commission of a crime by the average person, similarly situated to these defendants, who is not ready and willing to commit it.’ ”
 
 Juillet, supra
 
 at 55, quoting
 
 People v Jamieson,
 
 436 Mich 61, 90; 461 NW2d 884 (1990). The record reflects that the police did “nothing more than present the defendant with the opportunity to commit the crime of which he was convicted,” which is insufficient to support a finding of entrapment.
 
 McGee, supra
 
 at 345.
 
 [4]
 

 
 *221
 
 Accordingly, the trial court did not clearly err in finding that no entrapment occurred.
 

 B. DEFENSE COUNSEL’S CROSS-EXAMINATION OF SLAVIK
 

 Defendant argues that the trial court erred in preventing defense counsel from cross-examining Slavik regarding his fear of going to trial on the armed robbery charge.
 

 “A trial court’s limitation of cross-examination is reviewed for an abuse of discretion.”
 
 People v Crawford,
 
 232 Mich App 608, 620; 591 NW2d 669 (1998).
 

 The trial court sustained the prosecutor’s objection when defense counsel asked Slavik about a statement he allegedly made to defendant’s mother that he was nervous about his girlfriend’s potential testimony during the armed robbery trial. The prosecutor objected and argued that the questioning was irrelevant because Slavik’s girlfriend had nothing to do with defendant’s plan to kill Gross. In response, defense counsel argued that the testimony would show Slavik’s fear about going to trial and, thus, his motivation to lie about his claims against defendant.
 

 The trial court did not abuse its discretion by limiting defense counsel’s cross-examination of Slavik on this issue. By that point, Slavik had answered numerous questions regarding his motivation for alerting the police to defendant’s plot to kill Gross. Slavik also admitted that his armed robbery charges were dropped in exchange for his assistance in this case. Further, Slavik’s anxiety about his girlfriend’s testimony is only remotely relevant to whether defendant
 
 *222
 
 participated in a plan to kill Gross, particularly in light of the overwhelming tape-recorded evidence of defendant’s participation. Moreover, were we to find that Slavik’s alleged statement to defendant’s mother had some minimal relevance, the transcript clearly shows that Slavik stated that he had no recollection of making it. Indeed, Slavik repeatedly told defense counsel that he did not recall any such conversation with defendant’s mother. Thus, defense counsel tried and failed to elicit an admission from Slavik that he confessed some apprehension about the trial, not merely because the trial court sustained the prosecutor’s objection, but because Slavik had no memory of the event. Accordingly, any error by the trial court in curtailing defense counsel’s question was clearly harmless.
 

 C. OBSTRUCTION OF JUSTICE
 

 Defendant challenges the sufficiency of the evidence and the trial court’s denial of his motion for a directed verdict on the obstruction of justice charge.
 

 When reviewing a trial court’s decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt.
 
 [People v Aldrich,
 
 246 Mich App 101, 122; 631 NW2d 67 (2001).]
 

 Further, “[t]he test for determining the sufficiency of evidence in a criminal case is whether the evidence, viewed in a light most favorable to the people, would warrant a reasonable juror in finding guilt beyond a
 
 *223
 
 reasonable doubt.”
 
 People v Nowack,
 
 462 Mich 392, 399; 614 NW2d 78 (2000).
 

 Our Supreme Court set forth the common-law offense of obstruction of justice in
 
 People v Thomas,
 
 438 Mich 448, 455-456; 475 NW2d 288 (1991):
 

 Obstruction of justice is generally understood as an interference with the orderly administration of justice. This Court, in
 
 People v Ormsby,
 
 310 Mich 291, 300; 17 NW2d 187 (1945), defined obstruction of justice as “ ‘impeding or obstructing those who seek justice in a court, or those who have duties or powers of administering justice therein.’ ” In
 
 People v Coleman,
 
 350 Mich 268, 274; 86 NW2d 281 (1957), this Court stated that obstruction of justice is “committed when the effort is made to thwart or impede the administration of justice.” While these definitions adequately summarize the essential concept of obstruction of justice, we believe they lack the specificity necessary to sustain a criminal conviction.
 

 The
 
 Thomas
 
 Court went on to further clarify the crime:
 

 Like breach of the peace, at common law obstruction of justice was not a single offense but a category of offenses that interfered with public justice. Blackstone discusses twenty-two separate offenses under the heading “Offences against Public Justice.” If we now simply define obstruction of justice as an interference with the orderly administration of justice, we would fail to recognize or distinguish it as a category of separate offenses. We find no basis for this at common law.
 

 To warrant the charge of common-law obstruction of justice, defendant’s conduct must have been recognized as one of the offenses falling within the category “obstruction of justice.”
 
 [Thomas, supra
 
 at 456-458, citing 4 Blackstone, Commentaries (1890), pp 161-177.]
 

 
 *224
 
 “Intimidation of a witness in judicial proceedings is an indictable offense at common law, associated with the concept of obstructing justice.”
 
 People v Vallance,
 
 216 Mich App 415, 419; 548 NW2d 718 (1996). Obviously, therefore, physically interfering with the witness’ ability to testify, especially by murdering the witness, clearly is an offense recognized at common law that constitutes obstruction of justice.
 
 [5]
 

 As the Court stated in
 
 Thomas,
 
 the crime of obstruction of justice occurs “
 
 ‘when the effort is made
 
 to thwart or impede the administration of justice.’ ”
 
 Thomas, supra
 
 at 455 (citation omitted). For example, in obstructing justice through coercion, the “crime is complete with the attempt” and “[w]hether the attempt succeeds in dissuading the witness is immaterial.”
 
 People v Tower,
 
 215 Mich App 318, 320; 544 NW2d 752 (1996). Thus, if a defendant harasses or physically prevents a witness from appearing or testifying, or attempts to do so, such actions constitute obstruction of justice, regardless of whether the witness ultimately appears or testifies.
 
 Id.
 

 In a case involving the obstruction of justice by physically preventing a witness from testifying in court, for actual obstruction to occur, the defendant must have committed an act in an effort to physically prevent the witness from testifying. Similarly, the crime of obstruction of justice through coercion is complete once the defendant attempts to intimidate a witness, but the defendant must actually make some
 
 *225
 
 oral or physical threat in order to commit the crime. Likewise, here, if defendant attempted to physically harm or disable Gross, the crime of obstruction of justice would be complete, regardless of whether defendant succeeded in ultimately preventing Gross from testifying. Moreover, if Milstead made such an attempt at defendant’s behest, this would be sufficient to convict defendant of obstruction of justice.
 

 However, the prosecutor presented no evidence of such an attempt. Though overwhelming evidence showed that defendant solicited Milstead and conspired with Milstead to kill Gross, no actual attempt was made on Gross’ life or his physical well-being. Therefore, this was not simply an unsuccessful attempt to obstruct justice, which is punishable as obstruction of justice, but a conspiracy thwarted before the coconspirators made an attempt at Gross’ life. Therefore, we agree with defendant that the trial court erred in ruling that defendant “committed] the crime of Obstruction of Justice by soliciting murder or conspiring to murder or both, to prevent the testimony of Brian Gross.” Solicitation or conspiracy alone is insufficient to establish actual obstruction of justice of this kind because some act in furtherance of that goal must be present. Accordingly, the trial court should have granted defendant’s motion for a directed verdict on this issue and his conviction and sentence for the obstruction of justice charge are hereby vacated. We emphasize, however, that ample evidence supported defendant’s conviction of conspiracy to obstruct justice, for which defendant was properly convicted and sentenced.
 

 
 *226
 
 D. ELEMENTS OF SOLICITATION OF FIRST-DEGREE MURDER
 

 Defendant next contends that insufficient evidence supported his conviction of solicitation of first-degree murder because the prosecutor failed to present evidence of imminence. MCL 750.157b.
 

 To support his claim, defendant relies on a case interpreting the former solicitation of murder statute, which applied to a “person who incites, induces or exhorts” another to commit murder. As defendant correctly observes, in
 
 People v
 
 Salazar, 140 Mich App 137, 144-145; 362 NW2d 913 (1985), this Court held that the words “incites, induces or exhorts” established an element of imminence. However, defendant was convicted under the current version of MCL 750.157b(2), which provides: “A person who solicits another person to commit murder, or who solicits another person to do or omit to do an act which if completed would constitute murder, is guilty of a felony punishable by imprisonment for life or any term of years.” The statute also states: “For purposes of this section, ‘solicit’ means to offer to give, promise to give, or give any money, services, or anything of value, or to forgive or promise to forgive a debt or obligation.” [MCL 750.157b(l).] As is clear from the current version of the statute, the Legislature removed the words “incites, induces or exhorts” from the crime.
 

 “The fundamental rule of statutory construction is to discern and give effect to the intent of the Legislature.”
 
 People v Venticinque,
 
 459 Mich 90, 99; 586 NW2d 732 (1998). Accordingly, as a rule, “ [i]f statutory language is clear and unambiguous, the Legislature must have intended the meaning it expressed,
 
 *227
 
 and the statute must be enforced as written.”
 
 Id.
 
 at 99-100. Nonetheless, defendant argues that this Court cited
 
 Salazar
 
 with approval in a case construing the current solicitation statute,
 
 Crawford,
 
 supra at 616. However, contrary to defendant’s contention,
 
 Crawford
 
 cites
 
 Salazar
 
 for the proposition that, to be found guilty of solicitation, a solicitor need not achieve his goal. In fact,
 
 Crawford
 
 sets forth the elements of solicitation to commit murder under the current statute, and implies no element of imminence:
 

 Solicitation to commit murder occurs when (1) the solicitor purposely seeks to have someone killed and (2) tries to engage someone to do the killing. Solicitation is complete when the solicitation is made. A contingency in the plan may affect whether the victim will be murdered, but does not change the solicitor’s intent that the victim be murdered. Actual incitement is not necessary for conviction.
 
 [Crawford, supra
 
 at 616 (citations omitted).]
 

 Accordingly, consistent with the plain language of MCL 750.157b(2) and the elements set forth in
 
 Crawford,
 
 the prosecutor was not required to present evidence of imminence and defendant’s claim on this issue is without merit.
 

 E. SENTENCE FOR SOLICITATION OF FIRST-DEGREE MURDER
 

 Defendant claims he is entitled to resentencing because the trial court mistakenly believed that it was required to sentence defendant to life imprisonment.
 

 This Court reviews a trial court’s sentencing decisions for an abuse of discretion.
 
 People v Cain,
 
 238 Mich App 95, 130; 605 NW2d 28 (1999). However, here, defense counsel failed to object at the sentencing hearing and thus failed to preserve this issue.
 
 *228
 
 Therefore, a defendant pressing an unpreserved claim of error “must show a plain error that affected substantial rights.”
 
 People v Carines,
 
 460 Mich 750, 774; 597 NW2d 130 (1999).
 

 Generally, “a defendant is entitled to resentencing where a sentencing court fails to exercise its discretion because of a mistaken belief in the law.”
 
 People v Green,
 
 205 Mich App 342, 346; 517 NW2d 782 (1994).
 

 For conspiracy to commit a crime that, if completed, would subject the offender to imprisonment for one year or more, “the person convicted . . . shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit. . . .” MCL 750.157a(a). Thus, because first-degree murder requires a sentence of life imprisonment, MCL 750.316(1), so must a sentence for conspiracy to commit first-degree murder. However, the solicitation statute at issue here does not adopt the sentencing provisions of the crime solicited; instead, the penalty for soliciting another person to commit murder is “imprisonment for life or any term of years.” MCL 750.157b(2).
 

 We interpret the trial court’s statement, “the penalty is life, it’s not any number of years up to life, it’s life,” as indicating that the court
 
 elected
 
 to impose a life sentence, not a term of years for the minimum with life as the maximum. Indeed, a “trial judge is presumed to know the law,”
 
 People v Garfield,
 
 166 Mich App 66, 79; 420 NW2d 124 (1988), and we, therefore, hold that the court’s statements reflect its discretion in imposing a life sentence, not a misunderstanding of the law. Accordingly, we affirm defendant’s sentence for solicitation of first-degree murder.
 

 Affirmed in part and vacated in part.
 

 [1]
 

 The record further indicates that defendant and Slavik roomed together from early 1998 until October of the same year. Slavik also roomed with Gross for approximately five months in 1997.
 

 [2]
 

 The jury also convicted Milstead in this matter, and his appeal is currently pending before this Court,
 
 People v Milstead,
 
 250 Mich App 391; 648 NW2d 648 (2002).
 

 [3]
 

 We also reject defendant’s argument that his own testimony was sufficiently exculpatory so that the trial court should have granted his motion to dismiss. As the trier of fact in an entrapment hearing, the trial court is in the best position to determine the credibility of the witnesses and we will not resolve that issue anew. See
 
 People v Jamieson,
 
 168 Mich App 332, 338; 423 NW2d 655 (1988);
 
 People v Vaughn,
 
 186 Mich App 376, 380; 465 NW2d 365 (1990). For the same reason, we reject defendant’s assertion that the trial court gave insufficient weight to evidence that Slavik had an interest in helping the police because he hoped his armed robbery charge would be dropped.
 

 [4]
 

 Defendant further claims that “[t]he prosecution presented no evidence that Defendant was known to them to commit crimes similar to the charges at issue in this case.” Contrary to defendant’s implication, it is not the prosecutor’s burden to prove that no entrapment occurred. Moreover, this is merely one factor that the court may consider in deciding whether entrapment occurred. In light of the overwhelming lack of evidence of
 
 *221
 
 entrapment, we are not persuaded by defendant’s assertion regarding this factor.
 

 [5]
 

 Though the statute does not apply to this case, our state Legislature recently codified the crime of obstruction of justice in 2000 PA 452, MCL 750.122(6), effective March 28, 2001: “A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a witness to attend, testify, or provide information in or for a present or future official proceeding.”